Statement of the Case.
MONROE, J.
Plaintiff sued for damages for the use and benefit of his minor son, who was injured whilst in defendant’s employ; the allegations of the petition being that the injury was the result of negligence for which defendant is responsible. The answer is a general denial, coupled with a plea of contributory negligence and negligence of the minor’s fellow servants.
It appears that the minor was 19 years and 7 months old, at the time of the accident, and that, for more than three years prior thereto, had been working for a logging company, sometimes at one of the jobs incidental to that business, and sometimes at another. His father testifies that he was “mighty healthy, strong, and stout. * * * ” He was a tolerable strong boy; nothing uncommon; “good and stout, and able to make a living.” About February 1, 1908, he applied to defendant’s foreman for work in the “loading crew,” and on February 4th he was assigned to work in that crew, as switchman, and worked during that day, and the next day, until 2:30 o’clock in the afternoon, when a log rolled off the car and, falling on him, inflicted the injuries here complained of. The loading was being done by means of a steam machine and a crew of six men. The machine was provided with wheels whereby it could be moved on the railroad track from one place to another; but, when in operation, those wheels were raised and the machine was allowed to rest on the track, for greater stability. The crew consisted of a “top load■er,” who was the foreman, and who superintended and aided in the spacing and arranging of the logs on the car; a “steam loader man,” who operated the machine and placed the logs on the car as he was directed by the “top loader”; a fireman for the steam loader, who also acted as helper to the crew; two “tongmen,” who attached and detached the tongs to and from the logs; and a switchman, who coupled and uncoupled cars, aided the top loader in arranging and spacing the logs on them, and, at the proper' moment, handed the toggle, or binder chain, to the top loader, from one side of the car, and, it being passed by the top loader over the .logs, made it fast on the other side, in order to secure the logs and prevent them from rolling off. The minor himself testifies as follows concerning the duties of switchman and the modus operandi of loading a car, to wit:
“A switchman has to undo the binder from around t-he bunk and has to do all the couplings, and pulls the spotting line, and couples the cars to the loader, and throws up the binder, the toggle chain; and he also helps the top loader when he needs you to hold the logs. * * * Q. Now, I want to understand exactly what is the proceeding by which you load cars. We will assume that there is a steam loader and, in front of it, an empty car, and logs on each side of the track, or on one side of the track. Now, can you, for my information, tell me exactly what is done to load? A. Well, the machine lets down on the track, and the tong pullers put in the tongs and put them into the end of the log, and the top loader stays on the spot and shows the machine man where to put the logs, and he pulls the log from out on the skidway and lifts it up and drops it on the car. Q. That is con *891 firmed until the car is loaded? A. Yes, sir. Q. At what time is the binder put on? A. Well, load about two bunks and put the binder on. Q. Bunks mean a tier of logs? A. Yes, sir.”
Elsewhere in the testimony it appears that the “bunkers” are the heavy pieces of timber, running across the logging car, upon which the logs rest, and it also appears that, whilst the term “bunkers” is applied to the tiers of logs, the “bunker logs” are more particularly the logs of the lower tier, which rest upon the bunkers of the car. Just pri- or to the accident here in question, Prank Sasser, the top loader, had, as usual, superintended (whilst standing or moving about on the ground) the loading of the logs on the car and the minor, Price, had rendered such assistance as he was called on for; both of them being on the west side of the car, whilst the logs were being pulled from the east side. Among other things, it was found necessary to chock the outside bunker log in order to hold it steady, and Sasser and Price, each used a “pine chunk” for that purpose. In putting on the upper tier, the outside, and last, log put on, on the west side, was some 32 feet long, while the others were under 20 feet, and the longer log extended beyond the end of the car, to within from 3 to 5 feet of the steam loader. The time having arrived for the putting on of the binder, Sasser mounted the load of logs, and Price started to go around to the east side of the car, where the binder chain was fastened, in order to hand it up to him, that he might pass it on over the load, and that it might be fastened (by Price, who was to return for that purpose) on the other side. But, just as Sasser was getting up on the logs, and as Price was starting to the other side of the car, which he was about undertaking to do by going under the projecting end of the long log, the steam loader pulled in a log, from the east side, which struck other logs, that were lying against the car, thereby jarring the car, and the long log rolled down on Price and stopped and injured him.
The specific complaints set forth in the petition are:
(1) That the car was defective in not being provided with chocks and stakes to keep the logs from rolling off.
(2) That the loading of the long log with the short ones was bad work and caused the shorter logs to shake out of place and the long log to roll off, as the result of the jar produced by the log that was pulled in by the steam loader.
(3) That Price was inexperienced and was not warned of the danger to which he was subjected.
(4) That Prank Sasser, the top loader, was young and was lacking in the experience necessary to enable him to give such warning.
The evidence shows that “stakes or standards,” high enough to hold in the logs of the upper tier, are never used on logging roads unless the cars are intended to be carried over some regular railroad (which was not the case here), the use of the binder chain serving to hold such logs in place for the purpose of getting them to the mill; that defendant’s cars are provided with bunker spikes which hold the bunker logs in place, but which are, sometimes, broken off, in which case, chocks of wood, or anything that' may be convenient, are used as temporary substitutes (as was the case in this instance). It further shows, however, that in this instance the bunker logs remained in their places, and that the rolling off of the log from the upper tier must have been caused by something else than the substitution of “pine chunks” instead of bunker spikes. It shows that, in the loading of cars on logging-roads, the logs are taken as they are found on the skidways, without regard to their relative lengths, and there is nothing which tends to show that to be bad loading.
*893 The evidence further shows that Price had worked for the Enterprise Lumber Company, a logging concern, for three years, and that, afterwards, he had worked and lived in a logging camp, in Grant parish, for two months. It is true that he says that he had never before been a member of a loading crew; but he seems to have done almost everything else in connection with the business, and some things which were, apparently, more dangerous than loading, and he must have been brought into such relation to loading as that he could not have been ignorant of its dangérs. Thus, he drove teams and hauled logs from the woods to the tramways; he worked on the skidways, rolling logs down from the cars to the skid-ways; he set tongs in the cart; he drove a “cross-haul,” which he describes as follows:
“It is a cart and oxen and long chains, and you hitch the oxen and put the chain under the logs and throw it back over the car and hitch the oxen and pull the logs up.”
He admitted tha.t he asked defendant’s foreman for the work to which he was assigned, and he was asked:
“You had seen a great deal of the logging business and had been around logging operations, and you felt that you could hold the position?”
To which he replied:
“Yes, sir.”
He also testified that, before he was employed, he had visited the place where the loading was going on several times, and had watched the work.
Opinion.
Upon the whole, considering the extent of his general experience, as a logger, with reference to the dangers of the particular work for which, at his own request, he was employed, we agree with the judge a quo that he must be considered to have assumed the risk of the accident by which he was injured. The evidence shows that, in the loading of the logs on cars, their rolling off is a matter of frequent occurrence, and Price must have known it. He himself testifies that, for some minutes before he started to get the binder chain, he was standing, doing nothing but watching the loading. He was, therefore, in as good a position as the top loader, or. any one else on the ground, to know whether the long log was resting securely in its “notch” or was merely balanced on the top of the log below it; and, if he felt any doubt upon the subject, a safer way of getting to the other side of the car than the one which he took, was open to him. By walking four or five feet further, he would have cleared the end of the long log and have been out of danger. We find that the top loader was a competent man, though, like Price, a young one, and we can discover no neglect on his part. Nor do we consider the steam loader man to blame. He went on with his work in the usual way, and what he was doing was as apparent to Price as to himself.
The judgment appealed from, which rejects plaintiff’s demand, is, therefore, affirmed.